# NO. 12-22-00208-CV

# IN THE COURT OF APPEALS

# TWELFTH COURT OF APPEALS DISTRICT

# TYLER, TEXAS

|  |  |  |
|---|---|---|
| *IN THE INTEREST OF C.B.,* | § | *APPEAL FROM THE 321ST* |
|  | § | *JUDICIAL DISTRICT COURT* |
| *A CHILD* | § | *SMITH COUNTY, TEXAS* |

## *OPINION*

In seven issues, C.S.B. appeals the trial court's order terminating his parental rights. We affirm.

### BACKGROUND

C.S.B. is the father of C.B., and A.L. is her mother. C.S.B. was C.B.'s primary conservator, and A.L. had standard visitation rights. On October 21, 2020, the Texas Department of Family and Protective Services (the Department) filed an original petition for protection of C.B., for conservatorship, and for termination of C.S.B.'s parental rights. In the removal affidavit, Lesley Hurley, a Department investigator, wrote that A.L., as well as C.S.B.'s father, R.B., and sister, C.M., were concerned for C.S.B.'s mental health and C.B.'s safety while in his care. Based on these concerns and C.S.B.'s uncooperativeness during the Department's investigation, the Department requested a writ of attachment to gain possession of C.B.

To facilitate the Department's possession of C.B., the police surveilled C.S.B.'s home until he and C.B. went to a gas station. When C.S.B. and C.B. exited the station, the police arrested C.S.B. for interference with child custody, and Hurley took C.B. to the Children's Advocacy Center for an interview. After the interview, C.B. was released to A.L.'s custody. C.S.B. remained in jail throughout the proceedings.

Following a bench trial, the trial court ordered the termination of C.S.B.'s parental rights based on findings that clear and convincing evidence supports such termination under

1

subsections (D) and (E) of Texas Family Code Section 161.001(b)(1) and such termination is in C.B.'s best interest. A.L. was appointed sole managing conservator of C.B. This appeal followed.

**MOTION FOR CONTINUANCE**

In C.S.B.'s first issue, he argues the trial court erred by denying his motion for continuance based on a finding that he was not competent to stand trial in his criminal case. In his second issue, he argues that by requiring him to proceed to trial in his termination case after he was found not competent to stand criminal trial, the court violated his "federal, state, statutory and fundamental rights and legal protections including his federal and 14th Amendment substantive and due process rights, his Texas Constitution Article 1, Section 19 due process rights and his fundamental due process rights." In his seventh issue, he argues that by requiring him to proceed to trial in his termination case after he was found not competent to stand criminal trial, the trial court denied him fair procedure. We address these issues together.

**Standard of Review and Applicable Law**

A motion for continuance shall not be granted "except for sufficient cause supported by affidavit, or by consent of the parties, or by operation of law." TEX. R. CIV. P. 251. The denial of a motion for continuance is reviewed under an abuse of discretion standard. *Garner v. Fidelity Bank, N.A.*, 244 S.W.3d 855, 858 (Tex. App.—Dallas 2008, no pet.). The denial will be reversed only if the trial court's action was arbitrary, unreasonable, or without reference to any guiding rules and principles. *Id.* (citing *BMC Software Belg. N.V. v. Marchand*, 83 S.W.3d 789, 800 (Tex. 2002)).

Parental competency is not a prerequisite to proceeding to trial under the Texas Family Code. *See generally* TEX. FAM. CODE ANN. §§ 161.001-161.210 (West 2022); *see also* *In re J.P.-L.*, 592 S.W.3d 559, 582 (Tex. App.—Fort Worth 2019, pet. denied). To the contrary, a parent's mental illness may serve as a basis for involuntary termination of parental rights. *See* TEX. FAM. CODE ANN. § 161.003.

When the state moves to destroy weakened familial bonds, it must provide the parents with fundamentally fair procedures. *Santosky v. Kramer*, 455 U.S. 745, 753-54, 102 S. Ct. 1388, 71 L. Ed. 2d 599 (1982). At a minimum, due process requires notice and an opportunity to be heard at a meaningful time and in a meaningful manner. *In re R.M.T.*, 352 S.W.3d 12, 17 (Tex.

2

App.—Texarkana 2011, no pet.). The process due in a situation is measured by a flexible standard that depends on the practical requirements of the circumstances. *Id.* In determining the due process required, we consider (1) the private interest affected, (2) the risk of erroneous deprivation of that interest, and (3) the government's interest. ***Mathews v. Eldridge***, 424 U.S. 319, 335, 96 S. Ct. 893, 903, 47 L. Ed. 2d 18 (1976).

**Analysis**

On April 11, 2022, the date set for the termination proceeding, C.S.B.'s attorney filed a sworn, written motion requesting continuance of the matter until forty-five days after restoration of his competency and a trial on his pending charges. In the motion, counsel acknowledged that the case was in an extension and the requested continuance would result in mandatory dismissal of the case on April 19. However, she argued that C.S.B.'s due process rights were denied because he was incarcerated throughout the proceedings, preventing him from completing the services required by the Department. Furthermore, he had not yet received competency restoration treatment, which made trial preparation difficult. Counsel attached her own affidavit stating that the facts in the motion were true and correct based on her personal knowledge.

After hearing the arguments of the parties, the trial court stated that its decision was difficult, but ultimately, where the case faced imminent automatic dismissal, C.S.B.'s incompetence could not override C.B.'s best interest and need for permanence. The court further noted that it provided all possible safeguards to address C.S.B.'s constitutional rights under the circumstances, including granting multiple continuances, appointing competent counsel who asserted and argued his position, and appointing a guardian ad litem to address the competency issue. Accordingly, the court denied the motion.

To determine whether the trial court violated C.S.B.'s due process rights by denying his motion for continuance and proceeding to a termination trial without a showing of competence to stand criminal trial, we consider the ***Mathews*** factors. *See **R.M.T.**,* 352 S.W.3d at 20. Concerning the private interests affected by the court's decision, both the parent's and child's interests must be considered. *See **In re M.S.**,* 115 S.W.3d 534, 547 (Tex. 2003). A parent's right to maintain custody and raise his child is an interest far more precious than any property right. *Id.* Thus, C.S.B.'s interest weighs heavily in favor of strong procedural protections. *See **R.M.T.**,* 352 S.W.3d at 20.

However, children have a strong interest in a prompt final decision on termination. *Id.* A child's emotional and physical interests must not be sacrificed to preserve the parent-child relationship. *Id.* When a parent's interests conflict with a child's, the child's best interest prevails. *Id.* at 21. Therefore, although C.S.B.'s parental rights are a compelling private interest, C.B.'s competing private interest favors proceeding to trial despite C.S.B.'s purported incompetency.

Concerning the state's interest, the family code tasks the Department with providing a "safe, stable, and nonviolent environment for the child." TEX. FAM. CODE ANN. § 153.001(a)(2) (West 2014). It further tasks the Department with resolving termination and conservatorship issues within a fixed time. *See id.* 263.401 (West Supp. 2022). The Department has an interest in a final decision that is not unduly prolonged with negative psychological effects on the child left in limbo. *See R.M.T.*, 352 S.W.3d at 22.

C.S.B. filed a motion for continuance on the same day the case proceeded to trial—April 11. The dismissal date was April 19. C.S.B. presented no evidence that another trial date was available before the dismissal date or that he could be treated and regain competency before the dismissal date. Because C.S.B. had already received one dismissal extension in October 2021, the family code did not allow for further extensions. *See* TEX. FAM. CODE ANN. § 263.401(b). A dismissal is self-executing and does not depend on a party's filing a motion or the court's taking any action. *See id.* § 263.401(a). When such a dismissal date is imminent, the state's interest in conducting the termination proceeding is urgent. *See R.M.T.*, 352 S.W.3d at 22. For these reasons, this factor weighs in favor of proceeding to trial.

Concerning the risk of erroneous deprivation of the parent-child relationship, although parental competency hearings are not required in termination proceedings, other procedures may be used to reduce the risk of erroneous deprivation. *Id.* The family code provides for the appointment of an attorney ad litem for a parent who is incapacitated or alleged to be unable to provide for their child because of mental illness. TEX. FAM. CODE ANN. §§ 161.003(b), 107.010 (West 2019). The code also provides that grounds for termination must be proved by clear and convincing evidence. *Id.* § 161.001(b). Finally, appellate courts must strictly scrutinize termination decisions. *R.M.T.*, 352 S.W.3d at 22.

Here, C.S.B. was competently represented in the termination proceeding by his attorney ad litem. He was further provided a court-appointed guardian ad litem. Given that C.S.B. was

provided with the family code's constitutional safeguards, we conclude that the risk of erroneous deprivation was minimal. *See id.* at 23. After considering the relevant factors, we conclude that C.S.B.'s due process rights were not violated when the trial court denied his motion for continuance and proceeded to the termination trial despite his being found incompetent to stand criminal trial. Accordingly, we overrule his first, second, and seventh issues.

## TERMINATION OF PARENTAL RIGHTS

In C.S.B.'s third issue, he argues that the trial court erred by terminating his parental rights. In his fourth issue, he argues that there is no or insufficient evidence to support the termination of his parental rights. In his fifth issue, he argues there is no or insufficient evidence to support a finding that termination of his parental rights is in C.B.'s best interest.

### Standard of Review and Applicable Law

Involuntary termination of parental rights embodies fundamental constitutional rights. *Vela v. Marywood*, 17 S.W.3d 750, 759 (Tex. App.—Austin 2000), *pet. denied per curiam*, 53 S.W.3d 684 (Tex. 2001); *In re J.J.*, 911 S.W.2d 437, 439 (Tex. App.—Texarkana 1995, writ denied). Because a termination action "permanently sunders "the bonds between a parent and child, the proceedings must be strictly scrutinized. *Wiley v. Spratlan*, 543 S.W.2d 349, 352 (Tex. 1976); *In re Shaw*, 966 S.W.2d 174, 179 (Tex. App.—El Paso 1998, no pet.).

Section 161.001 of the family code permits a court to order termination of parental rights if two elements are established. TEX. FAM. CODE ANN. § 161.001; *In re J.M.T.*, 39 S.W.3d 234, 237 (Tex App.—Waco 1999, no pet.). First, the parent must have engaged in any one of the acts or omissions itemized in the second subsection of the statute. TEX. FAM. CODE ANN. § 161.001(b)(1); *Green v. Tex. Dep't of Protective & Regulatory Servs.*, 25 S.W.3d 213, 219 (Tex. App.—El Paso 2000, no pet.); *In re J.M.T.*, 39 S.W.3d at 237. Second, termination must be in the best interest of the child. TEX. FAM. CODE ANN. § 161.001(b)(2); *In re J.M.T.*, 39 S.W.3d at 237. Both elements must be established by clear and convincing evidence, and proof of one element does not alleviate the petitioner's burden of proving the other. TEX. FAM. CODE ANN. § 161.001; *Wiley*, 543 S.W.2d at 351; *In re J.M.T.*, 39 S.W.3d at 237.

The clear and convincing standard for termination of parental rights is both constitutionally and statutorily mandated. TEX. FAM. CODE ANN. § 161.001; *In re J.J.*, 911 S.W.2d at 439. Clear and convincing evidence means "the measure of degree of proof that will

produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." TEX. FAM. CODE ANN. § 101.007 (West 2019). The burden of proof is upon the party seeking the deprivation of parental rights. *In re J.M.T.*, 39 S.W.3d at 240.

When confronted with both a legal and factual sufficiency challenge, an appellate court must first review the legal sufficiency of the evidence. *Glover v. Tex. Gen. Indem. Co.*, 619 S.W.2d 400, 401 (Tex. 1981); *In re M.D.S.*, 1 S.W.3d 190, 197 (Tex. App.—Amarillo 1999, no pet.). In conducting a legal sufficiency review, we must look at all the evidence in the light most favorable to the finding to determine whether a reasonable trier of fact could have formed a firm belief or conviction that its findings were true. *In re J.F.C.*, 96 S.W.3d 256, 266 (Tex. 2002). We must assume that the fact finder settled disputed facts in favor of its finding if a reasonable fact finder could do so and disregard all evidence that a reasonable fact finder could have disbelieved or found incredible. *Id.*

The appropriate standard for reviewing a factual sufficiency challenge to the termination findings is whether the evidence is such that a fact finder could reasonably form a firm belief or conviction about the truth of the petitioner's allegations. *In re C.H.*, 89 S.W.3d 17, 25 (Tex. 2002). In determining whether the evidence presented to the fact finder has met this standard, an appellate court considers all the evidence in the record, both that in support of and contrary to the trial court's findings. *Id.* at 27-29. Further, an appellate court should consider whether disputed evidence is such that a reasonable fact finder could not have reconciled that disputed evidence in favor of its finding. *In re J.F.C.*, 96 S.W.3d at 266. The trier of fact is the exclusive judge of the credibility of the witnesses and the weight to be given their testimony. *Nordstrom v. Nordstrom*, 965 S.W.2d 575, 580 (Tex. App.—Houston [1st Dist.] 1997, pet. denied).

## Termination under Sections 161.001(b)(1)(D) and (E)

The trial court may order termination of the parent-child relationship if it finds by clear and convincing evidence that the parent knowingly placed or knowingly allowed the child to remain in conditions or surroundings which endanger the physical or emotional well-being of the child. TEX. FAM. CODE ANN. § 161.001(b)(1)(D). Subsection (D) addresses the child's surroundings and environment. *In re N.R.*, 101 S.W.3d 771, 775-76 (Tex. App.—Texarkana 2003, no pet.). The child's "environment" refers to the suitability of the child's living conditions as well as the conduct of parents or others in the home. *In re S.R.*, 452 S.W.3d 351, 360 (Tex. App.—Houston [14th Dist.] 2014, pet. denied). The relevant time frame to determine whether

there is clear and convincing evidence of endangerment is before the child was removed. ***Ybarra v. Tex. Dep't of Human Servs.***, 869 S.W.2d 574, 577 (Tex. App.—Corpus Christi 1993, no pet.). Further, subsection (D) permits termination based on a single act or omission. ***In re R.D.***, 955 S.W.2d 364, 367 (Tex. App.—San Antonio 1997, pet. denied).

The trial court may order termination of the parent-child relationship if it finds by clear and convincing evidence that the parent engaged in conduct, or knowingly placed the child with persons who engaged in conduct, that endangers the physical or emotional well-being of the child. TEX. FAM. CODE ANN. § 161.001(b)(1)(E). "Endanger" means to expose to loss or injury or to jeopardize. ***Tex. Dep't of Human Servs. v. Boyd***, 727 S.W.2d 531, 533 (Tex. 1987). It is not necessary that the conduct be directed at the child or that the child actually suffers injury. ***Boyd***, 727 S.W.3d at 533. Termination under subsection (E) must be based on more than a single act or omission. ***In re D.T.***, 34 S.W.3d 625, 634 (Tex. App.—Fort Worth 2000, pet. denied). Subsection (E) requires us to look at the parent's conduct alone, including actions, omissions, or the parent's failure to act. ***In re D.J.***, 100 S.W.3d 658, 662 (Tex. App.—Dallas 2003, pet. denied). Scienter is not required for an appellant's own acts under Section 161.001(b)(1)(E), although it is required when a parent places the child with others who engage in endangering acts. ***In re U.P.***, 105 S.W.3d 222, 236 (Tex. App.—Houston [14th Dist.] 2003, pet. denied), *overruled on other grounds*, ***In re L.C.L.***, 599 S.W.3d 79, 85-86 (Tex. App.—Houston [14th Dist.] 2020, pet. denied).

Generally, conduct that subjects a child to a life of uncertainty and instability endangers the physical and emotional well-being of the child. ***In re R.W.***, 129 S.W.3d 732, 739 (Tex. App.—Fort Worth 2004, pet. denied). Though imprisonment of a parent is insufficient, standing alone, to constitute "engaging in conduct which endangers the emotional or physical well-being of the child," it is a factor to consider on the issue of endangerment. *See* ***Boyd***, 727 S.W.2d at 533-35. Because it exposes the child to the possibility that the parent may be impaired or imprisoned, illegal drug use may support termination under subsection (E). ***Walker v. Tex. Dep't of Family & Protective Servs.***, 312 S.W.3d 608, 617-18 (Tex. App—Houston [1st Dist.] 2009, pet. denied). A fact finder can consider the history of abuse between the parents for purposes of subsection (E), even if the children were not always present. ***In re Z.M.***, 456 S.W.3d 677, 686 (Tex. App.—Texarkana 2015, no pet.).

In this case, the evidence shows that C.S.B.'s close family members became concerned for his mental health a few years before this case was opened when he began to behave violently and show signs of delusions and paranoia. In May 2020, R.B. asked A.L. to exercise her extended summer visitation with C.B. so he could get C.S.B. some help. Early in the visitation, C.B. began to cry and told A.L. she did not want to go back home. When asked why, C.B. stated that C.S.B. kept locking her in her bedroom and replaced her bedroom doorknob with a "flat doorknob." A CPS case was opened in June and closed with C.B. in A.L.'s possession and A.L. agreeing to file for a custody modification.

After C.B.'s first day of school, both A.L. and C.S.B. arrived to pick her up. She entered A.L.'s vehicle, but A.L. could not immediately leave because she was blocked by other vehicles. C.S.B. began yelling and insisting that C.B. leave with him, and school officials compelled her to do so. C.B. was scared, upset, crying, and did not want to go with C.S.B. Thereafter, C.S.B. enrolled C.B. in online learning and did not allow A.L. her visitation rights. Sporadically, C.S.B. allowed C.B. to FaceTime A.L., but their interaction was strictly monitored.

Sometimes C.B. used C.S.B.'s phone to call A.L. when C.S.B. was asleep. C.S.B.'s words and actions scared C.B. She could not leave the home because he installed several locks on the inside of the front and back doors, including a padlock on the back door, and kept the keys on his person. Sometimes C.S.B. screamed at the top of his lungs at imaginary people while looking at the ceiling, sometimes for an entire day. Other times he tried to harass C.B. into admitting that a multitude of apparently imaginary people were controlling her. A.L. contacted law enforcement, but C.S.B. refused to allow her to take C.B. for visitation even in their presence.

In October 2020, the Department opened a second case. Hurley, accompanied by law enforcement because of the mental health concerns, attempted to contact C.S.B. at his home. At first, there was no response. Hurley contacted R.B. and C.M., who corroborated the intake information. Eventually, C.S.B. opened the door after a deputy knocked. He appeared fine and normal. Hurley informed him that she was there to talk about mental health and "possible allegations of sexual abuse by a friend of his." C.S.B. refused to allow Hurley to take C.B. to the Children's Advocacy Center for an interview, stating that he believed A.L., R.B., and C.S.B.'s ex-girlfriend were involved. He allowed Hurley to view C.B. through the screen door. C.B.'s arms were crossed and she looked scared and shaky. Hurley saw several firearms propped behind

her on the furniture. She also noticed bars on C.B.'s bedroom windows and a very tall fence with barbed wire around it.

Based on the visit, Hurley believed that C.B. was in imminent danger. She was concerned about C.B.'s fearfulness and inability to escape the house in case of a fire. C.S.B.'s behavior caused further concern about possible drug abuse. On October 21, Hurley obtained a removal order and writ of attachment. C.S.B. refused to open the door when the Department attempted to serve him. Deputy Tina Glover, a sheriff's office process server, also attempted to personally contact him to no avail. After many such attempts, she served the citation by securely posting it on his door. When Glover drove by the house the next day, the citation was gone.

One night while law enforcement was watching the house, C.S.B. and C.B. went to a gas station. When they came out, law enforcement took C.S.B. to the ground and struggled to place him in hand restraints. C.S.B. appeared to be trying to reach his waistband. The detectives discovered two handguns and two knives on his person. C.B. was so frightened by the incident that she lost bladder control. She was taken to the Children's Advocacy Center and interviewed. C.B. also testified at trial.

According to C.B., she loves C.S.B. but is afraid of him and does not want to be alone with him. When she was about eight years old, he began behaving strangely. At first, he looked at the ceiling and whispered. Eventually, the whispering became yelling and sometimes lasted an entire day. C.S.B. believed that people teleported into the home to steal from him, lasered him, microwaved his elbow, and telepathically "dropped drugs" on him. A.L. kept C.B. for a few months to keep her safe, but school officials forced her to go with C.S.B. She cried for two days wanting to see A.L.

A few weeks later, C.S.B. began saying that over thirty-five people, most of whom C.B. did not know, were controlling C.B. He said that someone named Gretchen was keeping C.B. awake at night and controlling what she said and did. He said that his ex-girlfriend controlled C.B. to wiggle her mouth when she was scared. When C.B. sneezed, C.S.B. asked who told her to sneeze. When she denied being told to sneeze and cried, C.S.B. ignored her cries and called her a liar. Sometimes C.S.B. slept all day. C.B. woke him because she wanted to go outside and play. He threatened to lock her in her room, but she was so bored that she persisted. C.S.B. became angry and asked, "Who's controlling her?" C.S.B. did not allow C.B.'s friends to visit

because he thought that the friends would control him and C.B. or the people controlling C.B. would also control her friends. When the dog barked, he said, "Stop controlling the dog."

C.B. told C.S.B. many times that no one was controlling her. C.S.B. responded by removing everything from her room except a bed and a rug. He removed her doorknob, installed a lock that locked from the outside, bolted her window shut, and installed bars on it. He said that he would continue to lock C.B. in the bedroom unless she said people were controlling her. Sometimes C.S.B. spanked her on the bottom and legs with a belt or flyswatter when she denied being controlled. One spanking left a welt. A couple of times C.S.B. threatened to shoot A.L. in the head. These events made C.B. feel sad and scared.

After C.S.B. was arrested, R.B. hired a locksmith to open C.S.B.'s safe to remove his guns for safety and found a crystalline substance he believed to be methamphetamine and a glass pipe with white residue inside. After performing the evaluation finding C.S.B. incompetent, Dr. Timothy Proctor diagnosed him with unspecified schizophrenia spectrum and other psychotic disorder, amphetamine use disorder, and history of methamphetamine-induced psychotic disorder. He believed C.S.B.'s psychosis started with his methamphetamine use.

On appeal, C.S.B. argues that the evidence is insufficient because "mental illness is not necessarily grounds to terminate parental rights." This argument fails because the trial court found termination grounds under subsections (D) and (E), not the statute that allows for termination because of mental illness. *See* TEX. FAM. CODE ANN. § 161.003.

C.S.B. further argues that the evidence is insufficient to support termination under Section 161.001(b)(1)(E) because it does not show his behavior was a voluntary, deliberate, and conscious course of conduct. He apparently contends that the finding of incompetence to stand criminal trial shows his behavior was not a voluntary, deliberate, and conscious course of conduct. However, scienter is not required for a parent's own acts under Section 161.001(b)(1)(E); scienter is required under subsection (E) only when the parent places the child with others who engage in endangering acts. *See **In re U.P.***, 105 S.W.3d at 236. Because C.S.B.'s own acts are at issue here, the Department was not required to prove scienter. *See **id.***; TEX. FAM. CODE ANN. § 161.001(b)(1)(E). C.S.B. makes no argument pertaining to termination under subsection (D).

Reviewing the evidence under the appropriate standards, we conclude that a reasonable fact finder could have formed a firm belief or conviction that termination of C.S.B.'s parental

rights is warranted under subsections (D) and (E) of Texas Family Code 161.001(b)(1). *See* TEX. R. APP. P. 47.1. Accordingly, we overrule C.S.B.'s third and fourth issues.

**Best Interest of the Child**

In determining the best interest of the child, a number of factors have been considered, including (1) the desires of the child; (2) the emotional and physical needs of the child now and in the future; (3) the emotional and physical danger to the child now and in the future; (4) the parental abilities of the individuals seeking custody; (5) the programs available to assist these individuals; (6) the plans for the child by these individuals; (7) the stability of the home; (8) the acts or omissions of the parent that may indicate the existing parent-child relationship is not a proper one; and (9) any excuse for the acts or omissions of the parent. *Holley v. Adams*, 544 S.W.2d 367, 371-72 (Tex. 1976).

The family code also provides a list of factors that we will consider in conjunction with the *Holley* factors. *See* TEX. FAM. CODE ANN. § 263.307(b) (West 2019). These include (1) the child's age and physical and mental vulnerabilities; (2) the magnitude, frequency, and circumstances of the harm to the child; (3) the results of psychiatric, psychological, or developmental evaluations of the child, the child's parents, other family members, or others who have access to the child's home; (4) whether there is a history of substance abuse by the child's family or others who have access to the child's home; (5) the willingness and ability of the child's family to seek, accept, and complete counseling services and cooperate with and facilitate an appropriate agency's close supervision; (6) the willingness and ability of the child's family to effect positive environmental and personal changes in a reasonable period of time; (7) whether the child's family demonstrates adequate parenting skills; and (8) whether an adequate social support system consisting of an extended family and friends is available to the child. *See id.* 263.307(b)(1), (3), (6), (8), (10), (11), (12), (13).

The evidence need not prove all statutory and *Holley* factors to show that termination of parental rights is in a child's best interest. *See Holley*, 544 S.W.2d at 372; *In re J.I.T.P.*, 99 S.W.3d 841, 848 (Tex. App.—Houston [14th Dist.] 2003, no pet.). In other words, the best interest of the child does not require proof of any unique set of factors nor limit proof to any specific factors. *In re D.M.*, 58 S.W.3d 801, 815 (Tex. App.—Fort Worth 2001, no pet.). Undisputed evidence of just one factor may be sufficient in a particular case to support a finding that termination is in the child's best interest. *In re M.R.J.M.*, 280 S.W.3d 494, 507 (Tex.

App.—Fort Worth 2009, no pet.). But the presence of scant evidence relevant to each factor will not support such a finding. *Id.* Evidence supporting termination of parental rights is also probative in determining whether termination is in the best interest of the child. *See **In re C.H.**,* 89 S.W.3d at 28-29.

<u>Analysis</u>

The evidence at trial showed that C.B. was eleven years old at the time of trial. C.S.B. remained incarcerated since his arrest and was awaiting competency restoration services before he could be tried on charges of interference with child custody, a state jail felony carrying a punishment of confinement for up to two years, and possession of a controlled substance, a third-degree felony carrying a punishment of imprisonment for up to ten years.

After evaluating C.S.B.'s mental health, Dr. Proctor considers him to be severely mentally ill. Delusional beliefs like his are often treatable, but they are the most difficult psychotic symptom to treat and often the last impacted. Although chronic psychotic symptoms may be managed through medication and counseling, such treatment does not cure the condition. A large portion of patients who follow their treatment regimens achieve some normalcy in their living experiences. It is possible for a person with a psychotic illness to be a good parent. Most defendants found incompetent are ultimately restored. However, of those who are not restored, persistence of delusions is one of the most common reasons for the failure. Competence to stand trial does not equate to parental ability. For a patient to engage in treatment, he must be willing to trust and interact with people. Dr. Proctor further explained that someone who engaged in the behaviors that C.S.B. engaged in would be more difficult to treat than someone who did not. C.S.B. was adamant that he has no mental problems.

C.B. has lived with A.L. since C.S.B.'s arrest. She feels safe in A.L.'s home and loves being with her. A.L.'s fiancé lives in the home and has been a big part of C.B.'s life since she was four years old. He is willing to be her long-term father figure and possibly adopt her. C.B. attends school and sees her friends and family, including her paternal family. She saw a Children's Advocacy Center counselor, Lenore Strickland, throughout the case and can continue seeing her. Strickland provides C.B. trauma-focused cognitive behavioral therapy. A.L. helps with C.B.'s emotional self-regulation at home when she experiences a triggering event. C.B. will discover triggers at each developmental stage and need support. A.L. completed parenting

classes, a psychological evaluation, and random drug testing. The Department has no concerns with her.

Reviewing the evidence under the appropriate standards, we conclude that a reasonable trier of fact could have formed a firm belief or conviction that termination of C.S.B.'s parental rights was in C.B.'s best interest. *See* TEX. FAM. CODE ANN. § 161.001(b)(2). Accordingly, we overrule C.S.B.'s fifth issue.

### REASONABLE EFFORTS TO RETURN CHILD

In C.S.B.'s sixth issue, he argues that the trial court erred "because the Department of Family and Protective Services failed to meet their statutory duty and their constitutional duty to protect the rights of parents and to make reasonable efforts to return a child to the parents." However, Section 161.001 does not require the Department to make any efforts to return the child to the parent under these circumstances. *See id.* § 161.001(b)(1)(E); *but see id.* § 161.001(b)(1)(N) (if parent has constructively abandoned child who has been in managing conservatorship of Department for not less than six months, Department must have made reasonable efforts to return child to parent before court may order termination of parent-child relationship). Accordingly, we overrule Appellant's sixth issue.

### DISPOSITION

Having overruled Appellant's first through seventh issues, we ***affirm*** the trial court's judgment.

GREG NEELEY
Justice

Opinion delivered January 19, 2023.
*Panel consisted of Worthen, C.J., Hoyle, J., and Neeley, J.*

(PUBLISH)

13



# COURT OF APPEALS

# TWELFTH COURT OF APPEALS DISTRICT OF TEXAS

# JUDGMENT

**JANUARY 19, 2023**

**NO. 12-22-00208-CV**

**IN THE INTEREST OF C. B., A CHILD**

---

Appeal from the 321st District Court

of Smith County, Texas (Tr.Ct.No. 20-2367-D)

---

THIS CAUSE came to be heard on the appellate record and briefs filed herein, and the same being considered, it is the opinion of this court that there was no error in the judgment.

It is therefore ORDERED, ADJUDGED and DECREED that the judgment of the court below **be in all things affirmed**, and that this decision be certified to the court below for observance.

Greg Neeley, Justice.
*Panel consisted of Worthen, C.J., Hoyle, J., and Neeley, J.*